IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


UNITED STATES OF AMERICA

VS.                              CRIMINAL NO. 3:06-cr-210-WHB-JCS

RODNEY CASE, KEVIN CLARK,
MIKE FULTON, DOUGLAS MURPHY,
and JAMES WARD


CONSOLIDATED FOR TRIAL WITH


UNITED STATES OF AMERICA

VS.                              CRIMINAL NO. 3:09-cr-6-WHB-JCS

RODNEY CASE, KEVIN CLARK,
MIKE FULTON, DOUGLAS MURPHY,
and JAMES WARD


OPINION AND ORDER[1]

This cause is before the Court on two motions filed by the defendants in the above referenced criminal cases. The Court, having considered the pleadings, the attachments thereto, as well as supporting and opposing authorities finds:

Defendants' Motion and Renewed Motion for Disclosure of the Record of the October 11, 2007, Grand Jury Proceedings Concerning the Return of the Superceding Indictment and to Dismiss the

---

[1] For the purposes of this Opinion and Order, Criminal No. 3:06-cr-210 will be referred to as "Case I", and Criminal No. 3:09-cr-6 will be referred to as "Case II".

Superceding Indictment if those Records Reveal Abuses of the Grand Jury Process is not well taken and should be denied.

Defendants' Motion and Renewed Motion to Require the Government to Elect Among Counts 7-9 and Counts 10-12 of the Superceding Indictment is not well taken and should be denied.

## I.  Factual Background and Procedural History

On November 7, 2007, in <u>Case I</u>, the Grand Jury returned a Second Superceding Indictment ("<u>Case I</u> Indictment") against Defendants.  Count 1 of the <u>Case I</u> Indictment charges Defendants with conspiracy in violation of 18 U.S.C. § 371.  Specifically, the indictment charges that Defendants "did knowingly and intentionally conspire and agree with each other" to:

> knowingly devise and intend to devise a scheme and artifice to defraud Eaton including to deprive Eaton of their rights to honest services and to obtain money and property from Eaton by means of materially false and fraudulent pretenses and representations and for the purpose of executing the scheme and artifice and attempting to do so, transmitted or caused to be transmitted by means of wire communications, in interstate commerce, certain writings, signs, signals, or sounds in violation of Section 1343, and 1346, Title 18, United States Code.

<u>See</u> <u>Case I</u> Indictment [Docket No. 179], ¶ 9(a).  The objects of the alleged conspiracy are that Defendants: "would and did leave their employment at Eaton and take engineering jobs at Frisby where they would and did compete directly against Eaton for aerospace contracts for hydraulic pumps and motors"; "would enrich themselves

through salaries and business by using property stolen from Eaton while at Frisby"; and "did attempt to recruit others, including engineers, to participate in and work for Frisby and to continue to acquire Eaton technology from former and present Eaton employees." Id. at ¶¶ 10-12. The methods and means of the alleged conspiracy are:

> Defendants used their positions as employees of Eaton, and without authority or permission and in direct breach of their agreements with Eaton, to take, steal and convert property belonging to Eaton, including but not limited to computer programs, files, spreadsheets and other technology, drawings, manuals, handbooks, business plans, financial models, instructions and CADs related to the design, specifications, manufacture and sale of military and commercial aviation hydraulics, pumps and other component parts;

> after the property and information was taken, stolen and converted from Eaton, [Defendants] carried it with them to Frisby where it was placed in their office and/or personal computers and used it to compete against Eaton for products listed for military and commercial contracts; and

> [Defendants] engaged in and caused various acts, transactions, and deceptions which were designed to and which enabled them to, among other things, enrich themselves through salaries, bonuses and/or commissions paid by Frisby.

Id. at ¶¶ 13-15. The phrase "in direct breach of their agreements with Eaton" in Paragraph 13 of the Case I Indictment apparently relates to certain documents signed by Defendants while employed by Eaton. See id. ¶¶ 3-7 (alleging that each Defendant "signed several documents relat[ing] to the treatment of confidential property and information belonging to Eaton, among them a Vickers

3

Acknowledgment of Trinova Corporation's Standards of Business Conduct, a Trinova Employee Invention and Confidential Information Agreement, and an Eaton Termination Understanding.").[2]

The overt acts allegedly undertaken to accomplish the objectives of the conspiracy include that Defendant James Ward ("Ward") sent an e-mail to Frisby on or about July 17, 2001, offering engineering services and to staff its engineering department; during October and November of 2001, Defendants interviewed for jobs with Frisby; Defendants all began to work for Frisby between January 4 through 14, 2002; Defendants Ward and Douglas Murphy ("Murphy") exchanged e-mails regarding recruiting other Eaton employees to work for Frisby; and each Defendant had Eaton property on his office computer at Frisby, the Frisby computer server, and/or his personal home computer, all in violation of 18 U.S.C. § 371. Id. at ¶¶ 16-24.

Counts 2-5 of the Case I Indictment charge that Defendants:

> aided and abetted by each other and others known and unknown to the Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud Eaton, including to deprive Eaton of the right to honest services, and to obtain money and property from Eaton by means of materially false and fraudulent pretenses and representations.

Id. at ¶ 26. To accomplish their allegedly fraudulent purposes, Defendants purportedly "engaged in and caused various acts, transactions, and deceptions to occur" which enabled them to "take,

---

[2] Eaton was formerly known as Vickers-Aeroquip. Id. ¶ 1.

steal and convert, without permission or authority, and in direct breach of their agreements, the property of Eaton to Frisby" and "used that property to compete with Eaton for contracts." Id. at ¶ 27. Further, Defendants allegedly "knowingly caused certain writings" which are identified as four e-mail communications that were sent from Jackson, Mississippi, to Clemmons, North Carolina, to be "transmitted in interstate commerce by means of wire communications" all in violation of 18 U.S.C. §§ 1343, 1346 and 2. Id. at ¶ 28.

Count 6 of the Case I Indictment charges that Defendants conspired:

> (a) to knowingly and with intent to convert to the economic benefit of anyone other than the owner thereof, a trade secret that is related to or included in a product that is produced for or placed in interstate commerce intending and knowing that the offense will injure the owner of the trade secret and steals, or without authorization appropriates, takes, carries away, conceals, or by fraud, artifice, or deception obtains the trade secret in violation of 1832(a)(1), Title 18, United States Code;

> (b) to knowingly and with intent to convert to the economic benefit of anyone other than the owner thereof, a trade secret that is related to or included in a product that is produced for or placed in interstate commerce intending and knowing that the offense will injure the owner of the trade secret and without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates or conveys the trade secret in violation of Section 1832(a)(2), Title 18, United States Code;

> (c) to knowingly and with intent to convert to the economic benefit of anyone other than the owner thereof,

> a trade secret that is related to or included in a product that is produced for or placed in interstate commerce intending and knowing that the offense will injure the owner of the trade secret and without authorization possessed the trade secret in violation of Section 1832(a)(3), Title 18, United States Code.

Id. at ¶ 30(a)-(c). The objects of the alleged conspiracy are that Defendants: left their jobs with Eaton and accepted employment with Frisby where "they would and did compete directly against Eaton for aerospace contracts for hydraulic pumps and motors"; "would enrich themselves through salaries and business by using property stolen from Eaton while at Frisby"; and "would and did attempt to recruit others, including engineers, to participate in and work for Frisby and to continue to acquire Eaton technology from former and present Eaton employees." Id. at ¶¶ 31-33. The manner and means of the alleged conspiracy are that Defendants:

> used their positions as employees of Eaton, to steal, take and convert, without permission or authority, information believed to be trade secrets consisting of technology related to the design, specifications, manufacturer and sale of military and commercial aviation hydraulics. As employees of Eaton, the defendants were in positions that allowed them access to information and property believed to be trade secrets of Eaton relating to the design and development of pumps for aerospace applications, including but not limited to Key Dims Computer Program (Keydims), Inline Part Matrix Spreadsheet, Sleeving of Cylinder, Inline Pump Design Handbook, Internal Cost Estimates for Creation of a Development and Test Center, and ESG EA Plan;

> copied ... and appropriated, without authorization, stole and carried away Eaton's property described in [above] to Frisby, where the defendants used them to compete against Eaton for products listed for military and commercial contracts;

6

> engaged in and caused various acts, transactions, and
> deceptions which were designed to and which enabled them
> to, among other things, enrich themselves through
> salaries, bonuses and/or commissions, which were based on
> the use of trade secrets that they had unlawfully
> acquired from Eaton.

Id. at ¶¶ 34-36. The overt acts allegedly undertaken to accomplish

the objectives of the conspiracy include that Ward sent an e-mail

to Frisby on or about July 17, 2001, offering engineering services

and to staff its engineering department; during October and

November of 2001, Defendants interviewed for jobs with Frisby;

Defendants all began to work for Frisby between January 4 through

14, 2002; Defendants Ward and Murphy exchanged e-mails regarding

recruiting other Eaton employees to work for Frisby; and each

Defendant had Eaton property on his office computer at Frisby, the

Frisby computer server, and/or his personal home computer, all in

violation of 18 U.S.C. § 1832(a)(5). Id. at ¶¶ 37-45.

Counts 7 through 9 are only charged against Defendants Mike

Fulton ("Fulton"), Murphy, and Ward, and allege that the three "did

knowingly steal and appropriate", "did knowingly copy", and "did

knowingly possess":

> without authorization trade secrets belonging to Eaton,
> specifically, technology related to the design,
> specifications, manufacture and sale of military and
> commercial aviation hydraulic products that are related
> to or included in a product that is produced for or
> placed in interstate or foreign commerce, including but
> not limited to, the process known as Sleeving of
> Cylinder, intending to convert the trade secrets to the
> economic benefit of someone other than the owner thereof,
> and intending or knowing that the offense would injure
> Eaton, the owner of the trade secrets, in violation of

[18 U.S.C. §§ 1832(a)(1) and 2, 1832(a)(2) and 2, and 1832(a)(3) and 2].

Id. at ¶¶ 46-51.

Counts 10 through 12 are only charged against Ward, and allege that he "did knowingly steal and appropriate", "did knowingly copy", and "did knowingly possess":

> without authorization trade secrets belonging to Eaton, specifically, technology related to the design, specifications, manufacture and sale of military and commercial aviation hydraulic products that are related to or included in a product that is produced for or placed in interstate or foreign commerce, including but not limited to, Key Dims Computer Program (Keydims), Inline Pump Design Handbook, and Inline Part Matrix Spreadsheet, intending to convert the trade secrets to the economic benefit of someone other than the owner thereof, and intending or knowing that the offense would injure Eaton, the owner of the trade secrets, in violation of [18 U.S.C. §§ 1832(a)(1) and 2, 1832(a)(2) and 2, and 1832(a)(3) and 2].

Id. at ¶¶ 52-57.[3]

On April 28, 2008, the Court entered an Order dismissing Counts 1-5, 9, and 12 of the Case I Indictment. The Government appealed. On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the dismissal of Count 1, and reversed the dismissal of Counts 9 and 12.[4] See United States v. Case, No. 08-60405, 2009 WL 301851 (5th Cir. Feb. 9, 2009).

---

[3] The preceding factual background and procedural history is reprinted, with minor changes, from the Opinion and Order entered in Case I on April 25, 2008. See 3:06-cr-210 [Docket No. 286].

[4] The Government did not challenge the dismissal of Counts 2-5 on appeal.

8

On January 21, 2009, while Case I was on appeal, the Grand Jury returned a new indictment against Defendants, which was docketed as Criminal No. 3:09-cr-6 ("Case II"). Count 1 of the Case II Indictment charges Defendants with conspiracy in violation of 18 U.S.C. § 371. Specifically, the Case II Indictment charges that Defendants "did knowingly and intentionally conspire and agree with each other":

> To knowingly devise and intend to devise a scheme and artifice to defraud Eaton including to deprive Eaton of their rights to honest services and to obtain money and property from Eaton by means of materially false and fraudulent pretenses and representations and for the purpose of executing the scheme and artifice and attempting to do so, transmitting or causing to be transmitted by means of wire communications, in interstate commerce, certain writings, signs, signals, or sounds in violation of Section 1343, and 1346, Title 18, United States Code.

> As part of the scheme to defraud, the defendants collected confidential information from Eaton at a time when they knew that were leaving Eaton to join a competitor company.

> As part of the scheme to defraud, all defendants signed agreements as set out in paragraphs 3 through 7 of the indictment which impose specific duties upon the defendants to not disclose, misappropriate or use at any time either during or subsequent to employment any confidential information of Eaton. "Confidential information" was defined in the Eaton Termination Understanding as "technical or business information that is not generally available to the public."

> As part of the scheme to defraud, all defendants signed the Eaton Termination Agreement with the intent to deceive and defraud Eaton into believing that the defendants were not taking confidential information belonging to Eaton, thus making a material misrepresentation to Eaton. By concealing and failing to disclose the theft of the information, the defendants

posed an independent business risk to Eaton or intended
to create or did create reasonably foreseeable economic
harm to Eaton.

As part of the scheme to defraud, the confidential
information was taken to Frisby by the defendants where
it was intended to be used and was used by the defendants
to economically benefit the defendants or to cause
economic harm to Eaton.

See Case II Indictment, [Docket No. 1], ¶ 9(a)-(e). The objects of

the alleged conspiracy are that Defendants: "would and did leave

their employment at Eaton and take engineering jobs at Frisby where

they would and did compete directly against Eaton for aerospace

contracts for hydraulic pumps and motors"; "would enrich themselves

through salaries and business by using property stolen from Eaton

while at Frisby, to economically benefit the defendants or to cause

economic harm to Eaton"; and "did attempt to recruit others,

including engineers, to participate in and work for Frisby and to

continue to acquire Eaton technology from former and present Eaton

employees." Id. at ¶¶ 10-12. The methods and means of the alleged

conspiracy are:

[Defendants] used their positions as employees of Eaton,
and without authority or permission and in direct breach
of their agreements with Eaton, to take, steal and
convert property belonging to Eaton, including but not
limited to computer programs, files, spreadsheets and
other technology, drawings, manuals, handbooks, business
plans, financial models, instructions and CADs related to
the design, specifications, manufacture and sale of
military and commercial aviation hydraulics, pumps and
other component parts;

[A]fter the property and information was taken, stolen
and converted from Eaton, [Defendants] carried it with
them to Frisby where it was placed in their offices

10

and/or on their office and/or personal computers and used it to compete against Eaton for products listed for military and commercial contracts; and

[Defendants] used the fraudulently obtained confidential information from Eaton to, among other things, enrich themselves through salaries, bonuses and/or commissions paid by Frisby.

Id. at ¶¶ 13-15. As in Case I, the phrase "in direct breach of their agreements with Eaton" apparently relates to certain documents signed by Defendants while employed by Eaton. See id. ¶¶ 3-7.

The overt acts allegedly undertaken to accomplish the objectives of the conspiracy include:

Ward sent an e-mail to Frisby on or about July 17, 2001, offering engineering services and to staff its engineering department;

On or about November 8, 2001, Eaton program Key Dimension (10-27-99).xls was copied to Ward's home computer while he was still an Eaton employee;

On or about October 20, 2003, after Ward became a Frisby employee, the Key Dimension (10-27-99).xls program was transferred to a directory on Ward's home computer;

On or about November 27, 2001, Defendants accepted offers of employment at Frisby;

On or about November 29, 2001, Eaton swaging data for F-15 and RAH - 66/S - 92 were copied onto Ward's home computer;

On or about April 6, 2002, the data from the F-15 and RAH - 66/S - 92 was used to create an excel spreadsheet that was located on Ward's user directory at Frisby;

On or about December 2, 2001, Eaton programs Keydim.bas, keydims.exe., key.exe, and key.pif were copied to Ward's home computer while he was still an Eaton employee;

On or about April 26, 2003, after Ward became a Frisby employee, the Keydim.bas, keydims.exe., key.exe, and key.pif programs were accessed while on Ward's computer;

On January 4, 2002, each defendant signed the Eaton Termination Understanding, which provided that he had returned all Eaton property including but not limited to all technical data proprietary to Eaton as well as all software designed and developed for Eaton including removing such software from any home computers. Each Defendant knew that he had not returned all of Eaton's property at the time he signed the Eaton Termination Understanding. Each Defendant knew that when he signed the Eaton Termination Understanding that he had no intention of abiding by the agreement or his promise;

Defendants began working for Frisby between January 4 and 14, 2002;

On or about June 10, 2002, Murphy gave a Frisby employee a hard copy of a design drawing of a spline shaft and e-mailed him a CAD drawing of the same shaft. The title block on the drawing had been removed. Pursuant to Murphy's instruction, the Frisby title block was added on the drawing;

On or about June 10, 2002, Murphy gave a Frisby employee a hard copy of a design drawing of a piston. The title block on the drawing had been removed. Pursuant to Murphy's instruction, the Frisby title block was added on the drawing;

In June of 2002, Murphy gave a Frisby employee a hard copy of a design drawing of a pad, wear and e-mailed him a CAD drawing of the same pad, wear. The title block on the drawing had been removed. Pursuant to Murphy's instruction, the Frisby title block and a specific part number was added on the drawing, and the vsi was removed and replaced with a mil spec;

In June of 2002, Murphy gave a Frisby employee a hard copy of a design drawing of a sleeve, actuator piston and e-mailed him a CAD drawing of the same sleeve, actuator piston. The title block on the drawing had been removed. Pursuant to Murphy's instruction, the Frisby title block was added on the drawing;

On or about February 6, 2003, an Eaton employee in Jackson, Mississippi, sent an e-mail regarding 3M Imperial lapping film specifications to Ward in Clemmons, North Carolina;

On or about March 14, 2003, a former Eaton employee in Jackson, Mississippi, sent an e-mail regarding the Eaton F-15 gun drive and piston and shoe subassembly to Fulton in Clemmons, North Carolina;

On or about April 18, 2003, a former Eaton employee in Jackson, Mississippi, sent an e-mail regarding the Eaton F-15 gun drive and piston and shoe subassembly to Fulton in Clemmons, North Carolina;

On January 22, 2004, each defendant possessed Eaton property in his office at Frisby

all in violation of 18 U.S.C. § 371.  Id. at ¶¶ 16-41.

Counts 2 and 3 of the Case II Indictment are identical to those charged in Counts 9 and 12 of the Case I Indictment, and were dismissed on motion of the Government on April 28, 2009.  See 3:09-cr-6 Order [Docket No. 67].

Two motions filed by Defendants are now before the Court.

## II.  Discussion

**A.  Defendants' Motion for Disclosure of the Record of the October 11, 2007, Grand Jury Proceedings Concerning the Return of the Superceding Indictment and to Dismiss the Superceding Indictment if those Records Reveal Abuses of the Grand Jury Process[5]**

In Case I, the original indictment was returned on December 20, 2006, and a superceding indictment was returned on October 11,

_____

[5]  This Motion was only filed in Case I.

13

2007.  On October 22, 2007, Defendants filed their Motion for Disclosure of the Record of the October 11, 2007, Grand Jury Proceedings Concerning the Return of the Superceding Indictment and to Dismiss the Superceding Indictment if those Records Reveal Abuses of the Grand Jury Process ("Motion for Disclosure").  In support of their motion, Defendants argue that because of the apparent manner in which the case was presented to the grand jury, and the speed in which the grand jury returned the superceding indictment, it is likely that their Fifth Amendment rights were violated, and dismissal of the superceding indictment may be warranted on that grounds.  Specifically, Defendants argue:

> The superceding indictment was returned by a new grand jury with no prior knowledge of this case in less than two hours, after hearing testimony from a single summary witness.  The speed with which the superceding indictment was returned strongly suggests that the October 11 grand jury did not conduct any independent investigation into the matter or make an informed decision in returning the numerous charges in the superceding indictment.  It also suggests that the grand jury may have been pressured into returning an indictment quickly on the afternoon of October 11 and was not informed of its right to hear directly from witnesses with firsthand knowledge.

See Mem. in Supp. of Mot. for Disclosure, 3:06-cr-210 [Docket No. 150], at 1-2.

After the subject Motion for Disclosure was filed, the grand jury returned a second superceding indictment against Defendants on November 7, 2007.  Thereafter, Defendants supplemented their Motion for Disclosure arguing:

The November 7, 2007, second superceding indictment did

> not add any additional counts or substantive allegations
> to the charges in the October 11, 2007 superceding
> indictment and contained only minor language changes.
> Thus, it is highly unlikely that the government made any
> substantive presentation to the grand jury on November 7,
> 2007 to procure the second superceding indictment. In
> all likelihood, the government relied on its previous
> presentation a month earlier to the same grand jury and
> simply explained to the grand jury the minor changes to
> the text of the indictment. Accordingly, the minutes of
> the proceedings before the grand jury concerning the
> October 11, 2007 superceding indictment remain centrally
> relevant to defendants' motion.

See Supplemental Mem. in Supp. of Mot. for Disclosure, 3:06-cr-210 [Docket No. 292], at 2. Through their supplemental pleading, Defendants move for the release of the October and November 2007 grand jury transcripts or, in the alternative, request that the Court conduct an *in camera* inspection of those transcripts. Defendants further request that after the release/review of the subject transcripts, that the superceding and second superceding indictments in <u>Case I</u> be dismissed in the event it is shown that they were procured in violation of their Fifth Amendment right to indictment by an independent and informed grand jury. <u>Id.</u> at 3.

Under Rule 6 of the Federal Rules of Criminal Procedure: "The court may authorize disclosure ... of a grand-jury matter ... at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." FED. R. CRIM. P. 6(e)(3)(E)(ii). On the issue of dismissal, the United States Supreme Court has held that "[o]nly a defect so fundamental that it causes the grand jury no longer to be

a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried." <u>Midland Asphalt Corp. v. United States</u>, 489 U.S. 794, 802 (1989). In order to justify the release of grand jury transcripts, Defendants must show (1) "the material they seek is needed to avoid a possible injustice in another judicial proceeding", (2) "the need for disclosure is greater than the need for continued [grand jury] secrecy", and (3) "their request is structured to cover only material so needed". <u>Douglas Oil Co. of Cal. v. Petrol Stops Nw.</u>, 441 U.S. 211, 222 (1979). <u>See also United States v. Procter & Gamble Co.</u>, 356 U.S. 677, 682 (1958)(explaining that the "indispensable secrecy of grand jury proceedings ... must not be broken except where there is a compelling necessity. There are instances when that need will outweigh the countervailing policy. But they must be shown with particularity.")(internal citations omitted). Thus, under Rule 6(e), a district court "may properly order release of grand jury materials" only in cases in which "a party demonstrates with particularity a 'compelling necessity' for the materials." <u>In re Grand Jury Testimony</u>, 832 F.2d 60, 62 (5th Cir. 1987)(quoting <u>Procter & Gamble</u>, 356 U.S. at 682).

Courts have held that the required showing of particularity and/or compelling necessity cannot be based on speculation. <u>See e.g. United States v. Torres</u>, 902 F.2d 205, 233 (2d. Cir. 1990)(explaining that a "review of grand jury minutes is rarely

permitted without specific factual allegations of government misconduct."); United States v. Edelson, 581 F.2d 1290, 1291 (7th Cir. 1978)(finding that unsupported speculation is not enough to constitute a particularized need for the purpose of releasing grand jury transcripts under Rule 6(e)); United States v. Rodriguez-Torres, 570 F. Supp. 2d 237, 242 (D.P.R. 2008)(explaining that because grand jury proceedings are entitled to a strong presumption of regularity, a defendant seeking disclosure of grand jury information under Rule 6(e) "bears a heavy burden of establishing that particularized and factually based grounds exist to support the proposition that irregularities in grand jury proceedings may create a basis for the dismissal of an indictment.").

In the case *sub judice*, although Defendants argue that the speed at which the superceding indictment was returned "suggests" that the government may have pressured the grand jury into returning the indictment quickly, and "suggests" that the grand jury was not informed of its right to investigate or hear directly from witnesses having first hand knowledge, they have not presented any factual support to show that governmental misconduct occurred during the grand jury proceedings. Additionally, although Defendants challenge the manner in which the grand jury proceedings were conducted on the grounds that it only heard from one summary witness, as opposed to witnesses with first hand knowledge, the Supreme Court has held that the "validity of an indictment is not

affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." United States v. Calandra, 414 U.S. 338, 344-45 (1974).

The Supreme Court has also held that, "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988). See also United States v. McKenzie, 678 F.2d 629, 631 (5th Cir. 1982)(explaining that under the applicable Fifth Circuit rule, "even in the case of the most egregious prosecutorial misconduct, the indictment may be dismissed only upon a showing of actual prejudice to the accused."). In the case sub judice, Defendants have not offered any evidence that the grand jury would not have returned either the superceding indictment or the second superceding indictment in Case I in the event they heard first hand testimony as opposed to testimony from the summary witness. As such, the Court finds that they have not established prejudice that would warrant dismissal of the subject indictments.

As Defendants have not produced factual evidence in support of their allegations that the prosecution engaged in improper conduct before the grand jury, and have not shown that they were prejudiced by any errors that allegedly occurred during the grand jury

proceedings, the Court finds that their Motion and Renewed Motion for Disclosure should be denied, and that their request for an *in camera* inspection of the subject grand jury transcripts should be denied.

**B.    Defendants' Motion to Require the Government to Elect Among Counts 7-9 and Counts 10-12 of the Superceding Indictment[6]**

In <u>Case I</u>, Fulton, Murphy, and Ward, are charged with (Count 7) stealing and appropriating in violation of 18 U.S.C. § 1832(a)(1), (Count 8) copying in violation of 18 U.S.C. § 1832(a)(2), and (Count 9) possessing in violation of 18 U.S.C. § 1832(a)(3), the process known as Sleeving of Cylinder.  Ward is also charged with (Count 10) stealing and appropriating in violation of 18 U.S.C. § 1832(a)(1), (Count 11) copying in violation of 18 U.S.C. § 1832(a)(2), and (Count 12) possessing in violation of 18 U.S.C. § 1832(a)(3) the Key Dims Computer Program (Keydims), the Inline Pump Design Handbook, and the Inline Part Matrix Spreadsheet.  Fulton, Murphy, and Ward move to require the Government to elect to prosecute only one charge among Counts 7, 8, and 9, and Ward moves to require the Government to elect to prosecute only one charge among Counts 10, 11, and 12.  These defendants argue that election is required because the subject counts are multiplicitous as they separately charge them with

---

[6]  This Motion was only filed in <u>Case I</u>.

stealing, duplicating, and possessing the same trade secrets. These defendants also argue that election is required under the rule of lenity.

In general, multiplicity results from the "charging of a single offense under more than one count of an indictment." United States v. Soape, 69 F.3d 257, 266 (5th Cir. 1999)(citing United States v. Nguyen, 28 F.3d 477, 482 (5th Cir. 1994)). The Fifth Circuit has recognized that "[t]he chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." Id. (quoting United States v. Cluck, 143 F.3d 174, 179 (5th Cir. 1998))(other citations omitted). In cases in which "overlapping statutory provisions create a risk of multiplicity, '[t]he test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not.'" United States v. Reedy, 304 F.3d 358, 363 (5th Cir. 2002)(quoting Nguyen, 28 F.3d at 482). In cases in which "a multipart transaction raises the prospect of multiplicity under a single statute, the question becomes 'whether separate and distinct prohibited acts, made punishable by law, have been committed.'" Reedy, 304 F.3d at 363-64 (quoting United States v. Shaid, 730 F.2d 225, 231 (5th Cir. 1984)).

In the present case, the Court finds that conviction under each of the applicable statutory provisions, i.e 18 U.S.C. §§ 1832(a)(1),(2), and (3), would require proof particular to each provision. Specifically, a conviction under 18 U.S.C. § 1832(a)(1) would require proof that the named defendants had stolen, appropriated, concealed, and/or obtained through fraud, artifice, or deception the subject trade secrets. A conviction under 18 U.S.C. § 1832(a)(2) would require proof that the named defendants duplicated, replicated, copied, and/or delivered the subject trade secrets. A conviction under 18 U.S.C. § 1832(a)(3) would require proof that the named defendants had received or possessed the subject trade secrets. As Sections 1832(a)(1), (2), and (3) each "require proof of an element that the other does not" the Court finds that Counts 7-9 and 10-12 in the Case I Indictment are not multiplicitous. See Soape, 69 F.3d at 266-67. See also Nguyen, 28 F.3d at 482 ("An offense is separate and distinct when conviction under one count requires proof of an additional fact that the other count does not require.")(quoting United States v. Guzman, 781 F.2d 428, 432 (5th Cir. 1986)); United States v. Nosal, No. CR 08-00237, 2009 WL 981336, at *4 (N.D. Cal. Apr. 13, 2009)(finding no multiplicity in an EEA case because each of the counts charged required proof that the others did not); United States v. Summit Refrigeration Group, Inc., No. 05-CR-151, 2006 WL 3091115, at *6-7 (E.D. Wis. 2006).

Fulton, Murphy, and Ward also argue that election as to Counts 7-9 and Counts 10-12 is required under the rule of lenity. In support of their motion, these defendants seemingly rely on the rule of lenity applied when constructing criminal statutes and the penalties they impose. See Mem. in Supp., 3:06-cr-210 [Docket No. 154], at 6 ("Nothing in the language or legislative history of the [Economic Espionage Act] suggests that Congress intended to impose multiple criminal penalties for the same alleged conduct."); Id. at 7 ("[T]he choice of Congress to refrain for any explicit statement in favor of multiple punishments speaks for itself. Without explicit instructions to the contrary, multiple charges for identical conduct should be dismissed."). Under this rule, "ambiguity as to congressional intent is resolved in favor of lenity." United States v. Evans, 854 F.2d 56, 58 (5th Cir. 1988)(citing Bifulco v. United States, 447 U.S. 381, 387 (1980)). The Fifth Circuit, however has found that satisfaction of the Blockburger[7] test, "in the absence of contrary legislative history or statutory wording, generally removes the ambiguity concerning congressional intent as to the separateness of offenses, which is the necessary predicate of the rule of lenity." Id. at 58. See Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)(explaining

---

[7] In Blockburger v. United States, 284 U.S. 299 (1932), the Supreme Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. at 304.

22

that the <u>Blockburger</u> test "serves a generally similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. In determining whether separate punishment might be imposed, <u>Blockburger</u> requires that courts examine the offenses to ascertain 'whether each provision requires proof of a fact which the other does not.'"); <u>United States v. Stovall</u>, 825 F.2d 817, 822 (5th Cir. 1987)("If both offenses require proof of a fact not necessarily required by the other then <u>Blockburger</u> is satisfied and sentences under each statutory provision may be constitutionally imposed even though there is a substantial overlap in the proof offered to establish the crimes.").

The Court finds that as the <u>Blockburger</u> test has been satisfied with regard to Counts 7-9 and Counts 10-12, and as the language in 18 U.S.C. § 1832 does not suggest that Congress intended to impose only one penalty, that the rule of lenity does not apply in this case. See <u>e.g.</u> <u>Summit Refrigeration</u>, 2006 WL 3091115, at *7 (finding that "the plain language of 18 U.S.C. § 1832 does not ... suggest that Congress intended that there be just one penalty for violating any one or more of the subsections contained therein. Rather, the plain language suggests that more than one penalty can be imposed. Moreover, nothing in the legislative history cited by the defendants supports their argument that Congress intended only one penalty for violations of various

subsections of § 1832.").  Accordingly, the Court finds that the Motion of Defendants to Require the Government to Elect Among Counts 7-9 and Counts 10-12 of the Superceding Indictment should be denied.

### III.  Conclusion

For the foregoing reasons:

IT IS THEREFORE ORDERED that the Clerk of Court is hereby directed to file a copy of this Opinion and Order in both Criminal No. 3:06-cr-210 and Criminal No. 3:09-cr-6.

IT IS FURTHER ORDERED that the Motion and Renewed Motion for Disclosure of the Record of the October 11, 2007, Grand Jury Proceedings Concerning the Return of the Superceding Indictment and to Dismiss the Superceding Indictment if those Records Reveal Abuses of the Grand Jury Process [Criminal No. 3:06-cr-210, Docket Nos. 149 & 311; Criminal No. 3:09-cr-6, Docket No. 26] are hereby denied.

IT IS FURTHER ORDERED that the Motion and Renewed Motion of Defendants to Require the Government to Elect Among Counts 7-9 and Counts 10-12 of the Superceding Indictment [Criminal No. 3:06-cr-210, Docket Nos. 153 & 311; Criminal No. 3:09-cr-6, Docket No. 26] are hereby denied.

SO ORDERED this the 1st day of September, 2009.

s/ William H. Barbour. Jr.
UNITED STATES DISTRICT JUDGE

24