IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

v.   CRIMINAL NO. 3:06-cr-210-WHB-FKB

RODNEY CASE, KEVIN CLARK,
MIKE FULTON, DOUGLAS MURPHY,
AND JAMES WARD

Consolidated for Trial with

UNITED STATES OF AMERICA

v.   CRIMINAL NO. 3:09-cr-6-WHB-FKB

RODNEY CASE, KEVIN CLARK,
MIKE FULTON, DOUGLAS MURPHY,
AND JAMES WARD

**Bill of Particulars**

COMES NOW, the United States of America, by and through the United States Attorney for the Southern District of Mississippi, and the undersigned Assistant United States Attorney, and files this Bill of Particulars in Response to the Court's March 30, 2010, Order. This Bill of Particulars is filed in addition to and not meant to supersede the Bill of Particulars and Supplemental Bill of Particulars, filed on June 15, 2009, and July 22, 2009, respectively, in Case No. 3:09-cr-6. The government will supplement this Bill of Particulars, if necessary.

1. *With respect to Counts 6-12, identify precise manner in which each defendant allegedly intended to use Eaton Corporation's alleged trade secrets for the economic benefit of someone other than the owner thereof;*

    The defendants left Eaton *en masse*, in a concerted manner, and each individually stole Eaton's confidential or proprietary property and/or trade secrets, in order to build an industry-leading design team, comprised of highly skilled professionals, who (1) employ state-of-the-art, automated tools, (2) are dedicated to the success of their customers and (3) design state-of-the-art hydraulic pumps and

motors. The creation of this new design team at Frisby Aerospace had the effect of allowing Frisby Aerospace to win lucrative proposals and benefit economically, without the expected start-up time and cost. At the same time, Eaton was harmed by having to face a new competitor in what was a well-established market. The knowing use of Eaton materials by the defendants benefitted Frisby Aerospace by allowing it to enter the market quickly and inexpensively - since it simply used Eaton's trade secrets and/or proprietary or confidential property developed over decades.

Each of the defendants' efforts were geared toward achieving the goal first articulated by defendant James Ward – providing Frisby with "an engineering department in a box." The use of Eaton's trade secrets provided economic benefits to Frisby Aerospace since it was awarded lucrative contracts on the basis of products designed using Eaton's trade secrets. Those include: the F-15 gun drive, the JSF gun drive, and the C-17 winch. Each defendant also intended that he would benefit financially because of the financial success of their new employer.

With these goals in mind, the defendants chose specific Eaton trade secrets or items they believed to be trade secrets that they intended to use at Frisby for Frisby's benefit (and their ultimate benefit) and to the detriment of Eaton:

1. James Ward intended to use Eaton's Key Dimensions computer program at Frisby to help Frisby design new hydraulic pumps and motors in less time and at a lower cost. The Key Dimensions program is designed to provide an engineer with the key dimensions necessary for the design of an Eaton-style pump or motor, with the input of a few key figures. With the aid of this program, an engineer can shave weeks off of the initial design process. Ward intended to use the information in his program to help Frisby design hydraulic pumps and motors quickly and at a lower cost, using Eaton's design tools.

2. James Ward, Douglas Murphy and Michael Fulton intended to use various Eaton drawings and documents discussing Eaton's process for sleeving bi-metallic cylinder blocks to help Frisby create a similar process. These defendants understood that Eaton's process had been perfected over a number of years and resulted in a robust product. They knew that attempting to create a similar process at Frisby without the benefit of Eaton's documents would take a significant amount of time and cost a significant amount of money.

3. James Ward intended to use Eaton's inline design pump handbook to help Frisby establish and train a team of engineers who could design hydraulic pumps and motors. Ward knew that Frisby did not have such a team when

>    he left Eaton to work for Frisby. Ward knew that Eaton's inline design pump handbook was created to provide junior engineers with the basic information necessary to learn to design hydraulic pumps and motors. He knew that creating such a handbook at Frisby, without the benefit of Eaton's handbook, would take a significant amount of time and cost a significant amount of money.
>
> 4. Rodney Case intended to use the Eaton MathCAD automated design tools at Frisby to create an automated design process at Frisby. Case intended these tools to allow a junior engineer to obtain the necessary information for a new pump or motor design after providing the minimal input information into the program. He intended to remove any information in the Eaton MathCAD automated design tools that identified the design tools as being Eaton documents and modify those design tools for use at Frisby.
>
> 5. Kevin Clark intended to use his file on the updating of Eaton's development lab to assist Frisby when it built its own development lab. Clark knew that Frisby did not have a development lab when he left Eaton to go to Frisby. He knew that Frisby intended to build a development lab, but had no experience in the design and running of a development lab. Clark intended to use the information he collected when he updated Eaton's development lab in the design of Frisby's new development lab.
>
> 6. James Ward intended to use Eaton's inline parts matrix to help Frisby design new hydraulic pumps and motors. From his work at Eaton, Ward understood that having a database of information about proven designs was essential to the creation of new designs for hydraulic pumps and motors as well as to the ability to submit credible and timely proposals on new products.

2. *With respect to Counts 6-12, identify the precise manner in which each defendant knew or intended that Eaton Corporation would be injured by defendants' alleged misuse of alleged Eaton trade secrets;*

   The defendants knew that Eaton would be harmed by the introduction of a new, strong competitor into the marketplace. They knew that Frisby would only be considered a new, strong competitor if it could immediately put out state-of-the-art designs at competitive prices. The defendants knew that Frisby would only be able to do so by using Eaton's technology.

3. *With respect to Counts 6-12, identify each and every bid or competition during the period from January 2002-January 2004 in which any defendant allegedly*

> *misused Eaton Corporation's trade secrets to the detriment of Eaton Corporation or the benefit of some other individual or Corporation.*
>
> > F-15, F-22 Gun drive
> >
> > JSF Gun drive
> >
> > C-17 Winch
> >
> > F-18 LEFD

4. *The identity of "property stolen from Eaton" that each defendant allegedly used while at Eaton;*

    *See* the 6/15/09 Bill of Particulars and the 7/22/09 Supplemental Bill of Particulars filed in Case No. 3:09-cr-6.

5. *The identity of the individuals whom the defendants allegedly recruited or attempted to recruit to "continue to acquire Eaton technology," approximately when this recruitment occurred, how each such individual was recruited, and which defendant allegedly recruited each such individual;*

    *See* the 6/15/09 Bill of Particulars filed in Case No. 3:09-cr-06.

6. *The identity of each and every one of the "computer programs, files, spreadsheets, and other technology, drawings, manuals handbooks, business plans, financial models, instructions and CADs" that the defendants allegedly took, stole, or converted;*

    *See* the 6/15/09 Bill of Particulars filed in Case No. 3:09-cr-06.

7. *What Eaton property and information was allegedly used to "compete against Eaton" and, with respect to each such item, the specific property or information used, the defendant or defendants who allegedly used it, what commercial or military contract the item was used in competition for, and how each item assisted the defendants.*

    *See* the 6/15/09 Bill of Particulars and the 7/22/09 Supplemental Bill of Particulars filed in Case No. 3:09-cr-6.  With respect to each item or information identified in the aforementioned bill of particulars,

    > The entire item taken from Eaton was used by the defendants;
    >
    > *See* BOP 1, *supra*, with respect to which defendant used the item.

Not all of the items taken from Eaton were used to compete against Eaton on a specific contract. Rather, many of the items, as discussed in response to BOP 1, *supra*, were used to help Frisby reach a basic level of competence necessary to allow Frisby to begin to compete for specific contracts. With respect to those items that were used for specific military or commercial contracts, those contracts have been previously identified in the June 15, 2009 Bill of Particulars and the July 22, 2009 Supplemental Bill of Particulars filed in Case No. 3:09-cr-6.

The way in which each item assisted the defendants is described in BOP 1, *supra*.

Respectfully Submitted,

DONALD R. BURKHALTER
Acting United States Attorney


By:   */s/ Angela Givens Williams*
      ANGELA GIVENS WILLIAMS
      Assistant United States Attorney
      One Jackson Place
      188 East Capitol Street, Suite 500
      Jackson, MS 39201
      (601) 973-2822
      MS Bar No. 102469

## **CERTIFICATE OF SERVICE**

      I, Angela Givens Williams, hereby certify that on April 30, 2010, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record, and further that an unredacted copy has been forwarded to all defense counsel via electronic mail.

                                              */s/ Angela Givens Williams*
                                              ANGELA GIVENS WILLIAMS
                                              Assistant United States Attorney